The issue presented in this unemployment compensation appeal is whether the trial court erred in ruling that claimant was disqualified from receiving benefits because of having voluntarily left his employment without good cause.
The essential facts are as follows: The claimant had been a truck driver with the employer for a little over three years prior to his last day of work on May 29, 1986. For the year immediately preceding his last day on the job, the claimant's duties mainly involved hauling lumber by-products on four-hour round trips. He testified that he *Page 1346 
would often make four of these trips a day, resulting in his averaging more than seventy hours a week for the year preceding his last day. Other drivers worked similarly long hours. The evidence showed that the claimant and other drivers complained when their hours dropped during lulls in the lumber business.
The claimant testified that he began experiencing fatigue and pain in his chest, resulting in a visit to a physician in March of 1986. His physician later wrote a letter corroborating the claimant's testimony that he had been advised to reduce his hours at work and that he had been placed on medication. It was undisputed that the employer had never received a medical report concerning the claimant's condition. However, the claimant had informed his employer in general terms that he had seen a doctor, who recommended that his hours be reduced. There was dispute as to whether his hours were reduced; there was no dispute that the claimant was able to take off when he so requested for periodic blood pressure tests and doctor's appointments.
On May 29 the claimant clocked in at 6:00 a.m., made one haul, and returned to the job site around noon. He was told to take another load, one that would normally require four to five more hours on the road. The claimant testified as follows regarding the conversation that took place at that time:
 "Mr. Lee was in Georgia; and the yard boss told me said how about taking that load of bark to Cullman. I said I done put in six; I said time I run this next five hours to Cullman, I said that will be 11. And come back and pull two more loads of chips, I would have in over 20 hours. I said I can't put them hours in. I said I been putting them in for two and a half months since I told y'all I was going to have to cut my hours down. He said well I'll have to let you talk to Eddie Belcher, which is the plant superintendent. The first time I ever talked to him about any load. So I went and told him the problem. He said you got to pull it or give the truck up. I said let me hear you right now. I said you mean I'm going to have to pull it every day like this, you won't let no driver relieve me none? He said as long as you stay here, you'll have to do it every day. I said I can't do it; I might as well let you have the truck cause I can't do it every day, keep putting these 18 to 20 hours in. He said well get your stuff out of the truck, my radio out of the truck. I went and picked my check up on Friday and the mill was closed down then. And I asked Mr. Lee about it and he said we done put somebody else in your truck. So I walked away."
Neither of the men with whom the claimant talked that day was called by either party at trial, but the sales manager, Mr. Lee, offered a different version of the claimant's final day at work:
 "Mr. Lagrone came and said he was not going to pull the load; that somebody else could pull it. It didn't have anything to do with the amount of hours that he had worked. It didn't have anything to do with his health. It only had to do with the fact that he did not want to pull the particular load that was pulled because he wanted somebody else to pull it. . . . Had [the claimant] that particular day walked in and said I've got to go be with my wife, I want to go to the doctor, I'm tired; everything would have been fine. But, no; he put an ultimatum to us that somebody else would pull the load and that he wasn't going to pull it. And at that time we are no longer the management of the lumber company, he is. And that is not right. And that's the option that was given to him."
The sales manager also testified as follows:
 "If I had wanted to fire [the claimant], I would have done it less than 60 days before when I brought him into my office and counseled him and put it in writing of things that he was doing wrong. And he tried to make me fire him that day; and I said Marlion if I wanted to fire you, I would have fired you a long time ago because of the things he had done that were against the policy of the company. But Marlion is a good driver and I kept him and put up with some of the stuff because I knew he was a good *Page 1347 
driver. Okay? So I have got no qualms with him; but at the time when I have got an employee trying to tell me what to do, you have got to draw a line and that is where the line was drawn."
It is well settled that the determination of whether an employee is disqualified from receiving unemployment compensation benefits because he left work voluntarily without good cause attributable to the employer is a question of fact, the resolution of which is governed by the ore tenus rule, where the court, as in the case at bar, sits without a jury. Taylor v. Director, Department of Industrial Relations,491 So.2d 964 (Ala.Civ.App. 1986). Thus, it is the duty of the trial court in unemployment cases to resolve conflicts in testimony of the claimant and his supervisor and to determine weight and inferences to be drawn from that testimony. Payne v.Director of Department of Industrial Relations, 405 So.2d 1322
(Ala.Civ.App. 1981).
Section 25-4-78(2), Code 1975, provides that "[a]n individual shall be disqualified for total or partial unemployment . . . [i]f he has left his most recent bona fide work voluntarily without good cause connected with such work." The phrase "good cause" as used in this section has been defined as substantial reason; just ground for such action; adequate excuse that will bear the test of reason; and always the element of good faith. Department of IndustrialRelations v. Lynch, 370 So.2d 1050 (Ala.Civ.App. 1979). A test of good cause is whether it is reasonable when measured by what the average or normal worker would have done under similar circumstances. Andala Co. v. Ganus, 269 Ala. 571, 115 So.2d 123
(1959). In Avondale Mills v. Burnett, 268 Ala. 82, 86,106 So.2d 885, 888 (1958), the court held the following:
 "We do not think the test of 'good cause' is whether the employee thought he was fired. If the employee, of his own violation, refuses to comply with a reasonable job direction by his employer, the employer is entitled to release him from employment. To hold otherwise would place an illogical duty upon the employer to retain recalcitrant employees or discharge them at its own risk. We do not think the law should operate to this result."
We have read the record and find that the trial court's conclusion is supported by the evidence. We are satisfied that under the facts at bar a reasonably prudent employee, before taking the drastic step of quitting his job, would have endeavored to make clear to his supervisors the grounds of his problems with the hours he was working and endeavored to resolve his work grievances in a less confrontational manner. Regarding the claimant's contention that the facts support a "constructive termination," the ore tenus rule also applies to the question of whether the claimant quit or was fired. Watkins v. Montgomery Days Inn, 455 So.2d 23
(Ala.Civ.App. 1984).
The failure of the claimant to make sufficient efforts to present his work grievances in any appropriate manner on the day in question justifies the conclusion that the claimant's decision to leave work was without good cause.
The case is affirmed.
AFFIRMED.
BRADLEY, P.J., and HOLMES, J., concur.