NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MICHAEL REILY, *Appellant*,

*v.*

ARIZONA DEPARTMENT OF ECONOMIC SECURITY, an Agency,

and,

PAYCHEX PEO III LLC, *Appellees*.

No. 1 CA-UB 21-0179
FILED 1-17-2023

Appeal from the A.D.E.S. Appeals Board
No.  U-1705821-001-B

**AFFIRMED**

COUNSEL

Carden Livesay LTD, Mesa
By Joshua W. Carden, Parker C. Fox
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Emily M. Stokes
*Counsel for Appellee ADES*

---

## MEMORANDUM DECISION

Presiding Judge Jennifer M. Perkins delivered the decision of the Court, in which Judge James B. Morse Jr. and Judge Michael J. Brown joined.

---

**P E R K I N S**, Judge:

¶1　　　　Michael Reily applied for unemployment insurance benefits, which a deputy from the Arizona Department of Economic Security ("ADES") approved and charged to Reily's former employer, Vision Community Center ("Employer"). Employer contested the deputy's determination and an Administrative Law Judge ("ALJ") affirmed, finding Reily was discharged for reasons other than willful or negligent misconduct. Employer appealed to the ADES Appeals Board ("Board"). The Board reversed, accepting the ALJ's factual findings but holding the ALJ misapplied the law to the facts. For the following reasons, we affirm the Board's decision to disqualify Reily from unemployment benefits.

## FACTS AND PROCEDURAL BACKGROUND

¶2　　　　Reily worked as a community manager for Employer from June 2016 to September 2020. In March 2020, Employer transitioned its employees to remote work due to the COVID-19 pandemic. In early August 2020, Employer required all employees, including Reily, to attend an in-person meeting at the office. At this time, Employer encouraged masks in common areas, but did not require them. Employer provided sanitation stations and masks for employees who wanted them. About half of the employees wore masks during the meeting.

¶3　　　　On August 14, 2020, Employer notified its employees via email that all employees must resume in-office work on August 31. To manage the risk of virus exposure, Employer planned to stagger employees' work schedules, keep doors closed to the public, install hand sanitizer stations, and provide masks and sanitizing wipes. Reily responded that he did not "feel comfortable returning to the office," given his age (60), and that he wished to continue working from home.

¶4　　　　Employer replied that working from home would "no longer be an option," but offered Reily a private conference room as his workspace and the choice to work on days with the least number of employees. Reily

claimed that he was in the "high risk age group for death" if exposed to the virus and stated he did not plan to return to the office until a vaccine became available. Employer replied it was taking all precautions possible and following the Center for Disease Control and Prevention's ("CDC") guidelines. Employer also asked if Reily wished to apply for an accommodation under the Americans with Disabilities Act ("ADA"), as two other employees with similar concerns had done; Employer allowed these employees to work from home after approval of their ADA accommodation applications. Reily responded that he would not qualify for an ADA accommodation based merely on his age.

¶5 On August 25, 2020, Employer reiterated that working from home was no longer an option for employees and warned Reily that if he did not return to the office by August 31, Employer would accept his "voluntary resignation." Reily emphasized that he was "NOT quitting" but did not plan to return to the office until there was a vaccine. Employer's Human Resources professionals advised Employer of its right to decide whether employees work at home or in-office. Reily did not appear to work in-office as directed, and on September 1, 2020, Employer informed Reily via email: "we have accepted your resignation, effective immediately." Employer then blocked Reily from accessing his work computer.

¶6 Reily subsequently applied for unemployment benefits, and an ADES deputy found him eligible for benefits because Employer discharged him for reasons other than employment-connected misconduct. Employer contested the determination, and an ALJ heard testimony from Reily and Employer's witnesses and representatives on April 20, 2021. During the hearing, Employer's representative testified that, in addition to the previously stated measures, Employer "replaced the ventilation systems in [its] buildings." Reily responded this was the first time he heard of the replacement, and that Employer did not tell anyone about ventilation system improvements.

¶7 Three days later, the ALJ affirmed the deputy's determination. The ALJ found that the evidence showed Reily "acted reasonably in light of the circumstances in refusing to follow [Employer's] instructions," and "[n]o additional reason was provided by [Employer] for why [Reily] could not continue to work from home on a full-time basis." The ALJ also found Employer "acted to end the employment and intended for the employment to end once [Reily] failed to appear for work in person." This separation from employment, the ALJ concluded, constituted a "discharge by the employer." And although "employer provided Reily with several options, none . . . truly addressed [his] concerns about [his]

health and safety." The ALJ concluded Employer did not meet its burden of proof showing it discharged Reily for a disqualifying reason, and that Reily acted reasonably, considering he "is over 60 years old, masks were not required in the office, and [Reily] was concerned for his own safety after his experience attending the in-person meeting at the office."

¶8        Employer appealed to the Board, arguing Reily "made zero effort to work with [Employer] to resolve his concerns about returning to the office." Employer also argued that it offered Reily several options, including: working in a private conference room and when the fewest employees were in the office; to apply for ADA accommodations; and to provide a doctor's note stating he could not come back to the office.

¶9        The Board reversed the ALJ. The Board did not find error in the ALJ's factual findings, but supplemented them with the following:

> When [Reily] expressed his reluctance to return to the office the Employer offered to provide him with a private office and to allow him to come in on days when fewer employees were present. Although the Employer's office had approximately 30 workers, the Employer was staggering schedules so that only a portion of the workforce would be in the office each day.
>
> The Employer also offered to accommodate [Reily's] request if he could provide a medical statement supporting his need to work from home. Other workers who provided statements from their doctors were permitted to continue to work from home after September 1. [Reily] declined to seek a medical statement from his physician, stating that he had no underlying medical conditions that would support such a request.

¶10       The Board agreed that Employer discharged Reily but found the ALJ erred "in concluding that the Employer must prove a business necessity for requiring its workers to work in the Employer's workplace rather than at home." It also determined that "a Claimant who refuses to report to the Employer's workplace must establish that the Employer's directive to perform work there is unreasonable," otherwise, the refusal is insubordination. Here, the Board found, "Employer determined that it could provide a safe environment" by replacing the ventilation system, installing sanitation stations, providing masks, and closing the office to the public.

**¶11**      The Board also found that Reily's "generalized fear" of COVID-19 and refusal to return to in-person work was based on his speculation that Employer was not following federal workplace guidelines, even though "Employer credibly testified masks were required in common spaces in the office when social distancing could not be maintained." And because Reily failed to rebut Employer's testimony about its mask policy and did not establish the office was unsafe or otherwise not in compliance with health and safety standards, the Board concluded that Reily's refusal to return to work was insubordination. The Board then disqualified Reily from unemployment insurance benefits.

**¶12**      Reily filed a timely application for appeal, and we granted leave to appeal under A.R.S. § 41-1993, appointed him pro bono counsel, and requested briefing on specific issues. The parties have briefed the issues, and we have considered the arguments.

## DISCUSSION

**¶13**      We defer to the Board's factual findings but review *de novo* whether the Board properly applied the law to the facts, and we will affirm the decision if it is supported by any reasonable interpretation of the record and substantial evidence. *Figueroa v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 548, 550, ¶ 9 (App. 2011); *Bowman v. Ariz. Dep't of Econ. Sec.*, 182 Ariz. 543, 545 (App. 1995). An "agency abuses its discretion when it misapplies the law or fails to consider the relevant facts." *Rios Moreno v. Ariz. Dep't of Econ. Sec.*, 178 Ariz. 365, 367 (App. 1994).

**¶14**      In any proceeding, the Board may "affirm, reverse, modify, or set aside" the decision. *See* A.R.S. § 23-672(C). The Board "is not bound by the Tribunal's findings of fact and has authority to make its own findings regarding factual or credibility issues." *Figueroa*, 227 Ariz. at 550, ¶ 9 (citing *Rogers v. Ariz. Dep't of Econ. Sec.*, 132 Ariz. 138, 141 (App. 1982)).

**¶15**      Reily argues the Board erred in finding that Employer required masks in the workplace, failed to consider whether an unsafe work environment justified his refusal to return to work, incorrectly suggested that he needed to obtain a doctor's note to get an accommodation, and erred in finding that his refusal to return to work constituted insubordination.

**¶16**      The Board found that Employer encouraged masks whenever social distancing was not possible and required employees to wear masks whenever they left their cubicles. At the hearing before the ALJ, Reily offered no evidence to rebut Employer's testimony that employees followed this policy upon the office's partial re-opening. And he would not

have been able to because he refused to return to the office after the early August meeting and apparently did not contact any co-workers to verify or allay his concerns about masking. The Board found the record contained sufficient evidence that Employer implemented and followed the mask protocols. The Board did not abuse its discretion. *See Figueroa*, 227 Ariz. at 550, ¶ 9 (the Board has the authority to make its own findings regarding factual or credibility issues).

¶17 Reily also argues the Board erred in failing to address that his refusal to return to work was justified due to an "unsafe work environment." The Board found Employer properly determined it could provide a safe work environment and concluded Reily's refusal to return to work in-office was based on his speculations that Employer was failing to follow federal workplace guidelines.

¶18 Notably, the Board acknowledged that Employer replaced the ventilation systems. Although Reily stated the first time he heard of this improvement was at the hearing, his email correspondence with Employer at minimum put him on notice that the office was following all CDC guidelines, which included "[i]mproving the building ventilation system." Employer assured Reily it was "taking all precautions [it] can and following the CDC guidelines." These communications, along with the representative's testimony that the systems were in fact replaced, supports the Board's finding that Employer complied with the applicable health safety standards at the time. The record shows the Board considered his unsafe work environment arguments but did not find them credible. The Board did not abuse its discretion. *See Figueroa*, 227 Ariz. at 550, ¶ 9.

¶19 The Board agreed with the Tribunal's conclusion that Employer was the moving party who acted to end the Reily's employment after he refused to report to the office on August 31. *See* Arizona Administrative Code ("A.A.C.") R6-3-50135(A)(1) (a separation from employment is a "discharge" when the employer acts to end the employment and intends that result). The record supports the finding that employer discharged Reily.

¶20 "When a discharge has been established, the burden of proof rests on the employer to show that it was for disqualifying reasons." A.A.C. R6-3-51190(B)(2)(b). Reily concedes that an employer "may generally require employees to work in-person." The A.A.C. provides:

> An employer has the right to expect that reasonable orders, given in a civil manner, will be followed and that a

supervisor's authority will be respected and not undermined. There is no precise rule by which to judge when a dispute with a supervisor constitutes insubordination if insolence, profanity, or threats are not involved. The pertinent overall consideration is whether the worker acted reasonably in view of all the circumstances.

A.A.C. R6-3-51255(A)(1). "Insubordination" includes "[r]efusal to follow reasonable and proper instructions." A.A.C. R6-3-51255(A)(1)(a).

**¶21** A.R.S. 23-619.01 defines "[m]isconduct connected with the employment" as "any act or omission by an employee which constitutes a material or substantial breach of the employee's duties or obligations pursuant to the employment or contract of employment or which adversely affects a material or substantial interest of the employer." A.R.S. § 23-619.01(A). "Wilful or negligent misconduct connected with the employment" includes:

> 1. Absence from work without either notice to the employer or good cause for failing to give notice, repeated absence from work without good cause where warnings regarding repeated absence have been received from the employer, frequent absences from work without good cause, . . . or repeated failure without good cause to exercise due care for punctuality or attendance in regard to the scheduled hours of work set by the employer.
>
> . . .
>
> 5. Insubordination, disobedience, . . . refusal to accept an assignment to work at certain times or to perform certain duties without good cause, refusal to follow reasonable and proper instructions given by the employer.

A.R.S. § 23-619.01(B).

**¶22** The record shows Reily refused to report to the office after numerous requests and mitigation efforts by Employer. There is no evidence that Employer's directive was unreasonable—the return-to-office directive applied to all employees and Employer implemented several measures to ensure workplace safety. Employer has the right to expect that its employees come in to work. A.A.C. R6-3-51255(1) (employer has the right to expect reasonable orders will be followed). It need not prove a business necessity for requiring its employees to come to the workplace. *See*

*id.* ("The pertinent overall consideration is whether the worker acted reasonably in view of all the circumstances."). Reily took no initiative to mitigate a balance between working at home and in-office, despite Employer's offers to give Reily his own private conference room, select office days with fewer employees, and invitation for Reily to provide documentation to support a valid medical concern.

**¶23** By refusing to report to work based on speculative concerns, Reily did not act reasonably in view of all of the circumstances. *See* A.A.C. R6-3-51255(A)(1)(a). Despite Employer's warnings, Reily willfully refused to follow his Employer's requests and remained absent from the workplace, actions that constitute insubordination. *See* A.R.S. 23-619.01(B). The Board did not abuse its discretion.

## CONCLUSION

**¶24** For these reasons, we affirm the Board's decision.



AMY M. WOOD • Clerk of the Court
FILED: AA